# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-19-00580-CR

**Xavior Rudolph Arzola, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 119TH DISTRICT COURT OF TOM GREEN COUNTY
### NO. B-17-0938-SB, THE HONORABLE BEN WOODWARD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

After Xavior Rudolph Arzola entered an open plea of guilty, the trial court found that he used a deadly weapon and found him guilty of the second-degree felony of manslaughter. *See* Tex. Penal Code § 19.04. After a bench trial on punishment, the trial court sentenced Arzola to eleven years in prison. *See id.* § 12.33. On appeal, Arzola contends that the trial court erred by admitting hearsay testimony and by excluding part of his closing argument. We affirm the judgment.

## Background

Arzola pleaded guilty to recklessly causing the death of Victor Omar Duarte while using a deadly weapon (a firearm) on July 19, 2017. After accepting Arzola's plea, the trial court took judicial notice of the presentence investigation. Arzola did not object to the notice. The court then heard testimony from police officers who responded to the scene or investigated the crime, an eyewitness to the crime, and members of Duarte's and Arzola's families.

Trinidad Dehoyos, an eyewitness to the homicide, testified that he knew Arzola and had considered Duarte a good friend. All three men and some other people spent the afternoon partying at an apartment and pool. The party transitioned in the evening to a house where Dehoyos and Christian Castro lived. Dehoyos, Arzola, and Duarte used cocaine. At some point, Arzola displayed his handgun, which had a clip with bullets in it, put a bullet into the chamber, and put the gun on the table. Dehoyos heard the gun fire, then saw Arzola with the gun in his hands like he was scared. Dehoyos testified that Arzola said, "I can't believe I shot him," referring to Duarte, who was unresponsive. Dehoyos, Arzola, and Castro left the house in a car. They stopped near some apartments, and Arzola got out and threw the gun away. During the drive Arzola said, "I didn't mean to shoot him." Dehoyos testified that Arzola and Duarte were on friendly terms and that Arzola appeared remorseful about the shooting.

San Angelo police detective Adrian Castro[1] testified about capturing Arzola. Based on information from a witness, police traced Arzola to another house. When directed over a speaker to come out of the house, Arzola went to a shed. Detective Castro testified that Arzola told him he went to the shed to smoke marijuana to calm down. Arzola did not come out of the shed voluntarily, but did not resist when officers went in and got him.

Detective Castro testified that Arzola admitted to shooting Duarte and said that the gun fired without him pulling the trigger. Detective Castro was not familiar with handguns like Arzola's firing without the trigger being pulled but conceded that guns can fire accidentally. Detective Castro testified that Arzola told police first that he threw the gun in a dumpster, then that he threw the gun in the woods, and then that he buried it. Officers went to the apartment complex where Arzola discarded the gun. They found ammunition magazines, bullets, and a

---

[1] Adrian Castro testified that he is not related to Christian Castro.

manual to a gun like Arzola's at the apartment complex but did not find the gun. Detective Castro said he wanted to find the gun to determine if the gun could have fired without Arzola pulling the trigger.

After Detective Castro told Arzola that he would be charged, Arzola asked if Detective Castro would pick up some clothes for him because jail was cold. Detective Castro testified that he was told by another detective that Arzola had declared that he would not help the investigators unless Detective Castro brought him some clothes.

Detective Castro testified that he was told that Arzola was not being cooperative with a blood draw at the hospital and that Arzola threatened that "a blood bath was going to occur if they tried to stick him with a needle." Arzola eventually provided the sample without being physically forced. The sample revealed cocaine, Xanax, and THC in Arzola's blood.

Detective Castro testified that Arzola's statements about the events after the shooting were inconsistent. Arzola did not call police about the shooting and did not call an ambulance for Duarte, but told Detective Castro that he felt like he owed his life to Duarte's family. Detective Castro testified that Arzola also said that, in addition to using half a gram of cocaine, he took a Xanax and drank a beer the night of the homicide.

Detective Castro testified that Arzola was convicted in August 2017—after this homicide—for a March 2016 offense of possessing up to 35 grams of marijuana in Missouri, where he had lived with his mother and stepfather. About three months after this shooting, Detective Castro happened upon Arzola looking at weapons in a store. In November 2017, four months after this manslaughter, Arzola was arrested for unlawfully carrying a gun openly in a car. Arzola was arrested for possession of a controlled substance in August 2018.

San Angelo police officer Michael Sams testified about the circumstances leading to his arrest of Arzola for possession of .44 grams of cocaine in August 2018. Sams testified that Arzola was smiling and laughing just prior to his arrest. Arzola initially denied that the cocaine was his, but then admitted that he had purchased the cocaine at the arrest location on several other occasions. Arzola indicated he had initially denied possessing the cocaine because he did not want to have his bond for this case revoked. Arzola told the officer he had completed drug treatment before this August 2018 arrest.

Duarte's mother, Debra Dehoyos, testified about her son's life and the effect of his death. She said he was friendly, full of life, and always looking for the good in people. He played football and lettered in weightlifting. He enjoyed school and was interested in history, politics, and sports medicine. He was killed before he started college. She described his death as a deep wound that she thought would never heal. She described every day as a struggle. She would never see him, touch him, hear him, or see the children he never had. He will always be missing from their family celebrations.

Arzola's mother, Melinda Taylor, testified that Arzola had no experience with firearms growing up, that guns were never around him, and that he had not owned a firearm. He played football from Pee Wee league through high school. As a teenager he moved from Kansas City, where he had lived with her, to San Angelo to live with his father. She testified that, after killing Duarte, Arzola changed drastically from his generally happy state, becoming very withdrawn and sad, carrying around a lot of guilt and shame. She testified that he had talked with a PTSD counselor and was still doing so at time of trial, and that he had sought drug treatment. She asked that he be placed on probation because the killing was accidental, he was not a danger to anyone, and he deserved an opportunity to right his wrong. She said he is a really

4

good kid, very loving, and God-fearing. She described him as being extremely remorseful and wanting a positive way to go forward in his life.

Ms. Taylor said Arzola attended drug treatment at ADACC,[2] going to group counseling three times a week and individual counseling once a week. She was surprised to learn that he used cocaine, Xanax, marijuana, and alcohol while underage. She said he called her in the morning after he had shot Duarte. He sounded extremely emotional or hysterical. She told him to call the police, but he did not. She had not known that police had to go into the shed to get him. He did not tell her he was in a gang or that he had purchased drugs from the same dealer several times. She testified that at ADACC he was referred to counseling for both substance abuse and PTSD. She testified that, after some counseling, he relapsed, was arrested, and was incarcerated for seven months for violating the conditions of his bond. At the time of trial, he had been out of jail for six months with no problems and had been in counseling, which she testified was helping.

Terrance Taylor, Arzola's stepfather, testified that he would be a good resource for Arzola if the trial court probated Arzola's sentence because Mr. Taylor had been imprisoned for involuntary manslaughter; after consuming some alcohol, he had driven a vehicle that was in a wreck that killed his passenger. He testified that Arzola is very intelligent and was respectful growing up. He hoped that Arzola would be allowed to return to Kansas City. He said that Arzola's counseling had brought to light some issues that Arzola and his family had not known about him, and that continued counseling would be beneficial.

Arzola's younger brother, Elijah, testified that Arzola had helped him with sports when they were in school. Elijah testified that Arzola was kicked out of class for being loud.

---

[2] The State provided in its brief that ADACC is an acronym for Alcohol and Drug Abuse Council for Concho County.

He said that Arzola had recently stopped using drugs and taken classes. His head was clearer. Elijah testified that Arzola would be surrounded by supportive family if released on probation.

**Discussion**

Arzola contends that the trial court erred (1) by allowing the State to elicit testimony repeating the statements of a non-testifying declarant and (2) by sustaining the State's objection to a portion of his counsel's closing statement regarding relevant punishment evidence.

**Admission of Evidence**

Arzola asserts that the trial court erred by admitting Detective Castro's statements, over defense objection, about what he was told of Arzola's resistance to providing a blood sample at a hospital, including an alleged threat that a blood bath was going to occur. The State contends that there was no error because the trial court had already taken judicial notice of the statement as part of the presentence investigation ("PSI"). Arzola concedes that the trial court could take judicial notice of the PSI but argues that it could not take notice of the truth of the statements in the PSI, citing *Tschirhart v. Tschirhart*, 876 S.W.2d 507, 508–09 (Tex. App.—Austin 1994, no writ).[3] Arzola contends that this Court cannot have fair assurance that the punishment imposed was not affected by any error in the admission of Detective Castro's testimony that Arzola was uncooperative and threatened a bloodbath if anyone tried to take his blood.

---

[3] The PSI is not in the appellate record, which prevents us from reviewing it and comparing it to the disputed testimony. *See Brewer v. State*, No. 1270-03, 2004 WL 3093224, at *1, *4 (Tex. Crim. App. May 19, 2004) (op., not designated for publication) (absence of PSI from record prevented appellate courts from assessing whether judicial notice of statements in PSI was sufficient substitute for formal proof of prior conviction).

We need not decide whether the admission of Detective Castro's testimony was error because any error in its admission was harmless based on the substance of that testimony irrespective of the admission of the PSI. An erroneous admission of evidence will result in reversal only if that error affected a substantial right of the defendant. *See* Tex. R. App. P. 44.2(b); *Roethel v. State*, 80 S.W.3d 276, 281–82 (Tex. App.—Austin 2002, no pet.) (erroneous admission of evidence is not constitutional error). A substantial right is affected when the evidence, viewed in light of the record as a whole, had a substantial and injurious influence in determining the verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). The punishment verdict must further the legitimate goals of penal sanctions, which are retribution, deterrence, incapacitation, and rehabilitation. *See Meadoux v. State*, 325 S.W.3d 189, 195 (Tex. Crim. App. 2010).

Even if the trial court erred by admitting Detective Castro's testimony about Arzola's behavior at the hospital, that admission did not have a substantial and injurious effect on the verdict because of the weight of the other evidence on which the trial court based its decision. Arzola's reported resistance and statement at the hospital were not the only evidence of his intent to conceal evidence and failure to cooperate with the investigation of this crime. He shot Duarte while voluntarily under the influence of three intoxicants but blamed the gun for firing without him pulling the trigger. He fled the scene of the crime without calling an ambulance for his friend or reporting the incident to police. He discarded the gun away from the crime scene. He then went to another house and, when police arrived and requested that he surrender, fled to a shed from which he refused to emerge until police entered and escorted him out; he did this despite his mother's advice that he call the police himself. When asked by police where the gun was, he gave different stories about where he hid it—none of which resulted in

7

recovery of the weapon. Further weighing against a community-supervision term is that (1) he committed this offense while awaiting sentence for an offense in Missouri, and (2) he committed additional offenses involving drugs and a weapon while released on bond concerning this offense. Despite participating in drug-abuse counseling, he purchased cocaine several times. He possessed a weapon in a vehicle in a manner forbidden by law. The court also heard Duarte's mother's testimony regarding the impact of her son's death. Evidence weighing in Arzola's favor included his non-resistance when police took him from the shed, his eventual non-resistance to the blood test, reports of his remorse, and the testimony about his otherwise good character; these witnesses, however, seemed unaware of the scope of his continuing violations of the law. Some testimony showed that Arzola had improved after being jailed for violating the terms of his release on bond.

This evidence was submitted to the trial court, not a jury. After hearing all of the evidence, the court stated the following:

> I can only consider this to be an accident in the broadest sense of the term accident, because this was a gross deviation from normal behavior. A very gross deviation. And then your actions following that are evidence not of remorse, but of trying to hide the consequences, or trying to avoid the consequences, particularly when we gave you bonds and you continued to violate the law after giv[ing] the bonds.

The trial court did not mention Arzola's reported conduct in the hospital as influencing its decision. The trial court imposed a prison sentence in the middle of the range authorized for a second-degree felony. *See* Tex. Penal Code § 12.33(a) (imprisonment for two to twenty years). In the context of the entire record, any error in the admission of Detective Castro's testimony about reports of Arzola's resistance and statements at the hospital did not influence the trial

court's decision to forgo community supervision and impose a midrange term of incarceration to address the goals of punishment.

## Closing argument

Arzola complains that the trial court harmed him by excluding his counsel's argument that he had "suffered post traumatic stress disorder from this incident." The State objected that there was no testimony that he had been diagnosed with post-traumatic stress disorder ("PTSD"). Arzola responded that there was testimony that he was being treated for PTSD and that the reasonable inference from that treatment is that he had been diagnosed with PTSD.

A trial court has broad discretion in controlling the scope of closing argument, but it may not prevent defense counsel from making a point essential to the defense. *Wilson v. State*, 473 S.W.3d 889, 902 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd); *Lemos v. State*, 130 S.W.3d 888, 892 (Tex. App.—El Paso 2004, no pet.). Proper argument consists of (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answer to argument of opposing counsel; and (4) a plea for law enforcement. *Davis v. State*, 329 S.W.3d 798, 821 (Tex. Crim. App. 2010). Prohibiting defense counsel from making a particular jury argument when counsel is entitled to do so is a denial of the defendant's right to counsel. *Wilson*, 473 S.W.3d at 902.

Arzola cites the following excerpts from his mother's testimony as supporting his argument that he suffered from PTSD:

Q. Okay. Do you know what type of counseling he is doing?

A. I know he has talked with a PTSD counselor. We just thought that would be the best route to go, so that was what we did.

Q. Now, is he doing that currently?

9

A.  He did, yes.

. . . .

Q.  Okay.  And at ADACC they referred him both to substance abuse counseling and to counseling for the PTSD; is that correct?

A.  Correct.

Q.  They felt like he needed it?

A.  Yes.

Arzola contends that his counsel's argument that he suffered PTSD summarized, or was at least a reasonable inference from, this testimony.  He notes that the Court of Criminal Appeals held in *Frazier* that, despite no testimony that the defendant lived in a residence, it was reasonable to deduce that the defendant was a resident when he was found in bed at the residence at 8:50 a.m. and men's clothing was found in the closet.  *Frazier v. State*, 480 S.W.2d 375, 381 (Tex. Crim. App. 1972).  He argues that it is similarly reasonable to deduce from this testimony that he suffered from PTSD.

We need not decide whether the trial court erred because the alleged error is harmless, even under the stricter constitutional error standard.  A trial court's improper denial of a permissible jury argument is a denial of the defendant's right to counsel, which is constitutional error subject to harm analysis under Texas Rule of Appellate Procedure 44.2(a).[4]  *Lemos*, 130 S.W.3d at 892; *see also Wilson*, 473 S.W.3d at 901–02.  Under Rule 44.2(a), an appellate court must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.  *Wilson*, 473 S.W.3d at 902.  The primary question is whether there is a reasonable possibility that the

---

[4]  Arzola appears to claim this is non-constitutional error because he was allowed to argue. The alleged error is harmless under the less stringent non-constitutional error analysis as well.

10

error might have contributed to the conviction or punishment. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998); *Wilson*, 473 S.W.3d at 902. We do not focus on the propriety of the outcome of the trial, but instead calculate as much as possible the probable impact of the error in light of the other evidence. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). We evaluate the record in a neutral, impartial, and even-handed manner. *Cantu v. State*, 395 S.W.3d 202, 211 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). We consider the nature of the error, the extent to which it was emphasized by the State, its probable implications, and the weight the judge would likely assign it in assessing punishment. *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011).

We see no reasonable probability that any error in the trial court's exclusion of Arzola's counsel's argument that Arzola "suffered from PTSD" contributed to the punishment assessed. The trial court heard the testimony about Arzola's state of mind at the shooting and in the minutes and months afterwards. It also heard testimony concerning Arzola's conduct intended to conceal the crime, the fact that this offense occurred while he was awaiting sentencing on the Missouri offense, and his continued misconduct despite being released on bond for this offense. The trial court also heard testimony about the treatment that Arzola was receiving. The court heard evidence that, after being jailed for violating his bond, the post-release counseling was helping Arzola.

In its final closing argument, the State did not mention, much less emphasize, any distinction between diagnosis and treatment for PTSD. The State did argue that Arzola underwent treatment to make himself look better for the court, because Arzola had repeatedly shown that he would not comply with conditions like those that would be imposed with probation.

Taken as a whole, the record does not show harmful error in the exclusion of the argument that Arzola suffered from PTSD. As set out above, the court stated that the punishment was influenced by the "gross deviation from normal behavior" in the shooting itself, Arzola's attempts to conceal the evidence, and his failure to comply with bond conditions. While Arzola might contend that the failure to comply with bond conditions particularly was a product of PTSD, the court heard evidence of his state of mind and his treatment for PTSD and nevertheless imposed the sentence it did. We conclude that the punishment was based on the trial court's assessment of the evidence presented, not on any error in its exclusion of the argument that Arzola suffered from PTSD. We conclude beyond a reasonable doubt that any error in sustaining the objection to the argument did not contribute to the punishment. Any error in excluding the argument was harmless.

## Conclusion

Having found no harm arising from either alleged error, we affirm the judgment.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Baker and Triana

Affirmed

Filed: August 4, 2021

Do Not Publish

12